**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Paul Cartwright, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Medtronic, Inc.; Medtronic USA, Inc.,<br><br>Defendants. | Case No. 0:26-cv-02495<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION AND SUMMARY OF ACTION

1. Plaintiff Paul Cartwright ("Plaintiff"), on behalf of himself and all others similarly situated, alleges the following against Defendants Medtronic, Inc. and Medtronic USA, Inc. (collectively, "Defendants").

2. This class action is brought on behalf of individuals whose sensitive and personally identifiable information ("PII") was stolen by cybercriminals in a cyber-attack that accessed Defendants' data on or around April 17, 2026 (the "Data Breach").

3. The Data Breach has likely affected millions of individuals across the country, though at this time it is unknown how many individuals' data has been compromised.[1] Issues related to the Data Breach are ongoing.

4. Upon information and belief, Defendants store a substantial amount of PII, including names, dates of birth, billing and mailing addresses, financial information, and Social

[1] Steve Alder, *Medical Device Maker Medtronic Announces Data Breach*, HIPPAA J. (Apr. 28, 2026), https://www.hipaajournal.com/medical-device-maker-medtronic-data-breach/

Security numbers. Defendants also store significant quantities of protected health information ("PHI"), including information received from business associates and, in some instances, directly from patients. Such information, including that of Plaintiff and Class Members, may have been accessed or compromised in the Data Breach (collectively, "Private Information" or "PI").

5. As of May 1, 2026, Defendants have yet to notify Plaintiff or provide the public with any specific information regarding its mitigation efforts in the fallout of this Data Breach.

6. Defendants and associated entities, as medical industry experts, knew and should have known how to prevent a common cyberattack.

7. If Plaintiff had known that his Private Information would be improperly handled, he would not have agreed to the collection or use of his Private Information in connection with his treatment involving Defendants' medical device.

8. Accordingly, Plaintiff asserts claims for violations of negligence, negligence *per se*, breach of implied contract and unjust enrichment/quasi-contract.

**PARTIES**

10. Plaintiff Paul Cartwright is a resident and citizen of the State of Mississippi. Plaintiff is a patient who underwent a procedure during which a pacemaker device manufactured by Defendants was implanted, and whose Private Information is stored and maintained by Defendants.

11. Defendant Medtronic, Inc. is a Minnesota corporation with its principal place of business in Fridley, Anoka County, Minnesota.

12. Defendant Medtronic USA, Inc., is a wholly owned subsidiary of Medtronic, Inc. It is a Minnesota Corporation with its principal place of business in Fridley, Anoka County, Minnesota.

## JURISDICTION AND VENUE

13. The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendants' citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

14. The Court has personal jurisdiction over Defendants because both Defendants are headquartered in the District of Minnesota.

15. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because Defendants maintain their principal places of business in this District and therefore reside in this District pursuant to 28 U.S.C. § 1391(c)(2). A substantial part of the events or omissions giving rise to the Class's claims also occurred in this District.

## STATEMENT OF FACTS

### A. Defendants Acquire, Collect, and Maintain Plaintiff's and Class Members' Private Information.

16. Medtronic is the world's largest medical device company by revenue. From pacemakers to surgical robots, Defendants employ more than 95,000 individuals across 150 countries. Defendants serve around 79 million patients annually and had $33.5 billion in revenue in the 2025 fiscal year.

17. As part of their regular course of business, Defendants collect and store vast quantities of PII and PHI, including information obtained from employees, partner hospitals and other healthcare entities, and individuals who use or are treated with their products and services. Upon information and belief, Plaintiff's PII and/or PHI was collected, stored, and maintained by Defendants. Defendants were entrusted with, and obligated to safeguard and protect, the PII and PHI of Plaintiff and the Class in accordance with all applicable laws.

18. Upon information and belief, in connection with the use of Defendants' products and services, Plaintiff and Class Members were required to provide, or had their information provided on their behalf, to Defendants, including by healthcare providers and other entities utilizing Defendants' products or services.

19. Upon information and belief, as part of its regular course of business, Defendants thereafter maintained and stored Plaintiff's and Class Members' Private Information on its systems.

20. Upon information and belief, while collecting Private Information from Plaintiff and Class Members, Defendants promised to provide confidentiality and adequate security for the data that it collected from them through their applicable privacy policies and through other disclosures in compliance with statutory privacy requirements.

21. By obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known it was responsible for protecting Plaintiff's and Class Members' Private Information from disclosure.

22. Defendants' website provides: "Our customer may sometimes be a hospital, physician, or other healthcare provider; at other times, patients themselves are our customers or clinical trial participants. We obtain the patient information on which our business depends in accordance with applicable laws . . . ."[2]

23. Defendants publicly claimed: "We maintain appropriate physical, technical and administrative security standards and procedures to safeguard our patient data and systems. Our

[2] Medtronic, *U.S. patient privacy principles*, https://www.medtronic.com/en-us/our-company/governance/principles-ethics/us-patient-privacy-principles.html (last accessed May 2, 2026).

employees are educated on the importance of our privacy and security policies and must comply with them. Employees are permitted to access and use only the patient information they need to perform their job duties."[3] This statement is materially misleading because Defendants failed to implement and maintain reasonable data privacy and security practices, as evidenced by the Data Breach.

24. At all relevant times, Defendants knew they were storing sensitive PI and that, as a result, its systems would be an attractive target for cybercriminals.

25. Defendants also knew that a breach of its systems, and exposure of the information stored therein would result in the increased risk of identity theft and fraud against the individuals whose PI was compromised.

26. Plaintiff and Class Members reasonably relied on Defendants' representations regarding privacy and data security—including their public statements concerning the safeguarding of patient data—as well as on Defendants' role in handling sensitive medical information, to ensure that their Private Information would be kept confidential, securely maintained, and disclosed only as authorized.

27. Yet, contrary to these representations and obligations, Defendants failed to adequately safeguard Plaintiff's and Class Members' Private Information and failed to implement reasonable data security measures, as evidenced by the Data Breach, which, upon information and belief, has impacted approximately 9 million patient records.

**B. The Data Breach and Defendants' Failure to Adequately Disclose the Same**

[3] *Id.*

28. The Data Breach occurred on or around April 17, 2026, and it is an evolving situation.

29. Defendants have not sent notice to affected individuals. The only information Defendants have provided is the following April 24, 2026, announcement on its website:

> Medtronic has determined that an unauthorized party accessed data in certain Medtronic corporate IT systems.
>
> We have not identified any impact to our products, patient safety, connections to our customers, our manufacturing and distribution operations, our financial reporting systems or our ability to meet patient needs.
>
> The networks that support our corporate IT systems, our products and our manufacturing and distribution operations are separate. Hospital customer networks remain separate from Medtronic IT networks and are secured and managed by customers' IT teams.
>
> **What We're Doing**
>
> Upon identifying this unauthorized access, we immediately took steps to contain the incident, activated our incident response protocols and engaged leading cybersecurity experts to support our investigation and remediation actions.
>
> We are working to identify any personal information that may have been accessed and will provide notifications and support services as needed. We will continue to provide updates to any impacted individuals as we learn more.
>
> **Our Commitment to our Patients, Customers and Employees**
>
> Protecting patients and the trust placed in Medtronic is our highest priority. The privacy and security of all data with which we are entrusted is a vital part of that. As we resolve any impact of this unauthorized access to data in our systems, we are simultaneously identifying additional ways to further optimize our system security. We currently do not expect a material impact on our business or financial results.[4]

---

[4] *Medtronic statement on unauthorized system access*, MEDTRONIC (Apr. 24, 2026), https://news.medtronic.com/Medtronic-statement-on-unauthorized-system-access

30. ShinyHunters, a well-known cybergang, took credit for the breach. On its Darkweb site, ShinyHunters claimed that it stole "over 9 million records containing PII."[5] In dark web page claiming credit, ShinyHunters threatened to leak the data it stole unless Defendants engaged in negotiations for a ransom payment by April 21, 2016.[6] The post has since been removed.[7]

31. In June 2025, Mandiant—a company offering cyber security services—publicly warned that ShinyHunters had begun to target Salesforce CRM customers using tactics such as impersonating IT support staff and requesting that employees accept a connection to Salesforce Data Loader. Once this connection is made, the hackers then exfiltrate the data from Salesforce.[8]

32. On June 4, 2025, Google's Threat Intelligence Group ("GTIG") echoed Salesforce's and Mandian's warnings, reporting that the cybercriminal organization UNC6240, (that is, ShinyHunters,) was using a common and well-known social-engineering vishing technique to gain unauthorized access to systems and databases.[9] GTIG explained that ShinyHunters was "a financially motivated threat cluster that specializes in voice phishing (vishing) campaigns specifically designed to compromise organizations' Salesforce instances for large-scale data theft and subsequent extortion."[10] GTIG also explained how to prevent such a breach, highlighted that

---

[5] Bill Toulas, *Medtronic confirms breach after hackers claim 9 million records theft*, BLEEPINGCOMPUTER (Apr. 27, 2026), https://www.bleepingcomputer.com/news/security/medtronic-confirms-breach-after-hackers-claim-9-million-records-theft/ (last accessed May 2, 2026).

[6] *Id.*

[7] *Id.*

[8] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, BLEEPING COMPUTER (July 26, 2025) (https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/) (last accessed May 2, 2026).

[9] *See* https://cloud.google.com/blog/topics/threat-intelligence/voice-phishing-data-extortion (last accessed May 2, 2026).

[10] *Id.*

it is now "essential for [Defendant] to configure and manage access, permissions, and user training according to best practices" to prevent such data security incidents.[11]

33. ShinyHunters has a history of conducting similar high-profile data breaches using the same type of tactics—including those against PowerSchool and SnowFlake, which impacted companies like Santander, Ticketmaster, AT&T, Advance Auto Parts, Neiman Marcus and Cylance.[12]

**C. Defendants' Data Breach Was Imminently Foreseeable and Preventable**

34. Despite the growing body of publicly available information regarding the rise of cyberattacks that compromise sensitive private information, Defendants' approach to maintaining the privacy of Plaintiff's and Class Members' Private Information was inadequate, unreasonable, negligent, and reckless. This is evidenced by the Data Breach.

35. It is well known that Private Information, including Social Security numbers and health-related records, are highly valuable commodities and frequent targets of cybercriminals. Companies that collect and maintain such sensitive information, including Defendants, know or reasonably should know that they are attractive targets for cyberattacks.

36. The Cybersecurity and Infrastructure Security Agency ("CISA") has designated the Healthcare and Public Health Sector as critical infrastructure. As companies that operate within and supporting this critical infrastructure sector, Defendants knew or should have known that its systems would be a prime target for cyberattacks. The Department of Homeland Security has

[11] *Id.*

[12] Lawrence Abrams, *Allianz Life confirms data breach impacts majority of 1.4 million customers*, BLEEPING COMPUTER (July 26, 2025), https://www.bleepingcomputer.com/news/security/allianz-life-confirms-data-breach-impacts-majority-of-14-million-customers/ (last accessed May 2, 2026).

recognized that "[c]ybersecurity threats to critical infrastructure are one of the most significant strategic risks for the United States."[13]

37. As companies that operate within and support the healthcare industry, Defendants should have been aware of the industry's ongoing struggle to address increasingly sophisticated cyberattacks. Since at least 2021, healthcare data breaches have risen to historically high levels in the United States. In 2022, the United States Department of Health and Human Services Office for Civil Rights ("OCR") received reports of 720 healthcare data breaches affecting 500 or more individuals.[14] In 2023, OCR received reports of 725 such breaches, exposing more than 133 million individuals.[15] Although the annual number of reported breaches has hovered in the range of approximately 700 to 725 incidents, the number of impacted individuals has increased dramatically. For example, between 2023 and 2024, the number of impacted individuals have increased dramatically from approximately 138 million to 259 million.[16]

38. In light of the largest healthcare breaches of 2023, including but not limited to HCA Healthcare (11,270,000 individuals affected), Perry Johnson & Associates, Inc. (8,952,212 individuals affected), Managed Care of North America (8,861,076 individuals affected), Welltok, Inc. (8,493,379 individuals affected), HealthEC LLC (4,452,782 individuals affected), and

---

[13] U.S. Dep't of Homeland Sec., Secure Cyberspace and Critical Infrastructure, https://www.dhs.gov/archive/secure-cyberspace-and-critical-infrastructure (last accessed May 2, 2026)

[14] Sean Roy, HIPAA Compliance Statistics: Key Stats & How to Reduce Risk in 2025, Dialog Health, https://www.dialoghealth.com/post/hipaa-compliance-statistics (last accessed May 2, 2026).

[15] Anne Turner, Securing Electronic Protected Health Information: The Role of Data Discovery in Modern Healthcare, Ground Labs (Apr. 25, 2024), https://groundlabs.com/blog/data-discovery-electronic-personal-health-information (last accessed May 2, 2026)

[16] John Riggi & Scott Gee, 2025 Cybersecurity Year in Review, Part One: Breaches and Defensive Measures, Am. Hosp. Ass'n (Oct. 7, 2025), https://www.aha.org/news/aha-cyber-intel/2025-10-07-2025-cybersecurity-year-review-part-one-breaches-and-defensive-measures (last accessed May 2, 2026).

Reventics, LLC (4,212,823 individuals affected), Defendants knew or should have known that the Private Information it collected and maintained would be a prime target for cybercriminals.[17]

39. In light of the largest healthcare breaches of 2024, including but not limited to Change Healthcare Inc. (190,000,000 individuals affected), Kaiser Foundation Health Plan, Inc. (13,400,000 individuals affected), Ascension Health (5,599,699 individuals affected), HealthEquity, Inc. (4,300,000 individuals affected), and Concentra Health Services, Inc. (3,998,163 individuals affected), Defendants knew or should have known that the Private Information it collected and maintained would be a prime target for cybercriminals.[18]

40. In light of the largest healthcare breaches of 2025, including but not limited to Conduent Business Services LLC (currently known to be more than 25 million individuals affected), Aflac (13,924,906 individuals affected), Yale New Haven Health System (5,556,702 individuals affected), Episource, LLC (5,418,886 individuals affected), Blue Shield of California (4,700,000 individuals affected), DaVita Inc. (2,689,826 individuals affected), and Anne Arundel Dermatology (1,905,000 individuals affected), Defendants knew or should have known that the Private Information it collected and maintained would be a prime target for cybercriminals.[19]

41. To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendants could and should have implemented the following preventive measures, as recommended by the United States Government:

---

[17] Dean Levitt, 76 HIPAA Breach Report Statistics for 2023, Paubox (Jan. 24, 2024), https://www.paubox.com/blog/76-hipaa-breach-report-statistics-for-2023 (last accessed May 2, 2026).

[18] Steve Alder, 2024 Healthcare Data Breach Report, HIPAA J. (Jan. 30, 2025), https://www.hipaajournal.com/2024-healthcare-data-breach-report/. (last accessed May 2, 2026).

[19] Steve Alder, Largest Healthcare Data Breaches of 2025, HIPAA J. (Jan. 2, 2026), https://www.hipaajournal.com/largest-healthcare-data-breaches-of-2025/ (last accessed May 2, 2026).

- **Implement an awareness and training program:** Educate employees and individuals about the threat of ransomware and how it is delivered, as end users are often the primary targets.

- **Enable strong spam filters:** Prevent phishing emails from reaching end users by using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to block email spoofing.

- **Scan all incoming and outgoing emails:** Detect threats by scanning emails and filtering executable files to prevent them from reaching end users.

- **Configure firewalls:** Block access to known malicious IP addresses to prevent unauthorized access.

- **Patch operating systems, software, and firmware:** Regularly update and patch devices, potentially using a centralized patch management system for greater efficiency.

- **Set anti-virus and anti-malware programs for regular scans:** Ensure these programs run automatic scans to detect and remove potential threats.

- **Manage privileged accounts based on the principle of least privilege:** Limit administrative access to users only when absolutely necessary, and ensure those with admin privileges use them only when required. Implement an awareness and training program.

- **Configure access controls:** Implement least privilege principles for file, directory, and network share permissions. Users should only have access to what they need—if a user only needs to read specific files, they should not have write access to those files, directories, or shares.

- **Disable macro scripts in office files transmitted via email:** Prevent the execution of potentially harmful macros by disabling them in office files sent via email. Consider using Office Viewer software instead of full office suite applications to open email attachments.

- **Implement Software Restriction Policies (SRP):** Use SRPs or similar controls to prevent programs from executing from common ransomware locations, such as temporary folders associated with web browsers or compression programs, including the AppData/LocalAppData folder.

- **Disable Remote Desktop Protocol (RDP):** If RDP is not in use, consider disabling it to reduce potential attack vectors.

- **Use application whitelisting:** Allow only programs that are explicitly permitted by security policy to execute, blocking any unauthorized or potentially malicious software.
- **Execute operating system environments or specific programs in a virtualized environment:** Run sensitive systems or programs in isolated virtual environments to reduce risk.
- **Categorize data based on organizational value:** Implement physical and logical separation of networks and data for different organizational units to protect critical information and ensure appropriate access control.[20]

42. To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendants could and should have implemented the following preventive measures, as recommended by the Federal Trade Commission ("FTC") in its latest update to *Protecting Personal Information: A Guide for Business*:

- Know what personal information you have in your files and on your computers.
- Keep only what you need for your business.
- Protect the information that you keep.
- Properly dispose of information you no longer need.
- Create a plan to respond to security incidents.[21]

43. To mitigate the heightened risk of ransomware attacks and other data breaches, including the incident that led to the Data Breach, Defendants could and should have implemented the following preventive measures, as recommended by the Joint Ransomware Task Force's

[20] U.S. Dep't of Just., Crim. Div., Computer Crime & Intellectual Prop. Section, How to Protect Your Networks from Ransomware, https://www.justice.gov/criminal/criminal-ccips/file/872771/dl (last accessed May 2, 2026).
[21] Federal Trade Commission, *Protecting Personal Information: A Guide for Business,* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last accessed May 2, 2026).

("JRTF") #StopRansomware Guide, although this list does not encompass the full range of recommended actions:

- **Conduct regular vulnerability scanning to identify and address vulnerabilities**, especially those on internet-facing devices, to limit the attack surface.

- **Regularly patch and update software and operating systems to the latest available versions.** Prioritize timely patching of internet-facing servers-that operate software for processing internet data such as web browsers, browser plugins, and document readers-especially for known exploited vulnerabilities….

- **Limit the use of RDP and other remote desktop services.** If RDP is necessary, apply best practices. Threat actors often gain initial access to a network through exposed and poorly secured remote services, and later traverse the network using the native Windows RDP client.

- **Ensure all on-premises, cloud services, mobile, and personal devices are properly configured, and security features are enabled.** For example, disable ports and protocols that are not being used for business purposes.[22]

44. As a custodian of Private Information, Defendants knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members because of a breach.

45. Despite widespread reports of data breaches, Defendants neglected to implement the necessary safeguards to ensure the Private Information of Plaintiff and Class Members was protected.

46. Defendants were, or should have been, fully aware of the unique types and the significant volume of data in their systems, amounting to potentially millions of individuals'

---

[22] Cybersecurity & Infrastructure Security Agency, *#StopRansomware Guide*, https://www.cisa.gov/resources-tools/resources/stopransomware-guide (last accessed May 2, 2026).

Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of this data.

47. Given that Defendants stored the Private Information of Plaintiff and Class Members that it collected or received from patients and business associates, Defendants could and should have implemented some or all of the above measures to prevent and detect cyberattacks.

48. The occurrence of the Data Breach indicates that Defendants failed to implement one or more of the above measures to prevent cybersecurity attacks. The failure to implement some or all of the above measures resulted in the Data Breach and the exposure of, upon information and belief, the Private Information associated with approximately 9 million patient records, including those of Plaintiff and Class Members.

**D. Plaintiff's and Class Members' Private Information Has Significant Value.**

49. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[23] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[24]

[23] 17 C.F.R. § 248.201 (2013).
[24] *Id.*

50. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[25]

51. Upon information and belief, the data compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information at the point-of-sale in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

52. For example, the process of replacing a Social Security number ("SSN") is both time-consuming and difficult. According to the Social Security Administration, individuals generally cannot obtain a new SSN where it has been compromised but there is no evidence of misuse. This leaves victims in a precarious position, effectively forced to wait until fraud occurs before they can take meaningful action to mitigate the damage. This delay places victims at continued risk of identity theft, financial fraud, and other forms of exploitation, making it significantly more difficult to protect themselves in the aftermath of a data breach.[26]

53. Unauthorized access to an individual's medical records or health information can have serious consequences. Stolen medical or health records can be stored for long periods, with individuals often remaining unaware that their records have been compromised or stolen.[27] Moreover, the monetary value of medical records on the dark web far exceeds that of credit card

[25] Tyler Lacoma, Your Personal Data Is for Sale on the Dark Web—Here's How Much It Costs, Digital Trends (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last accessed May 2, 2026).
[26] Soc. Sec. Admin., Identity Theft and Your Social Security Number (SSA Pub. No. 05-10064, Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf (last accessed May 2, 2026).
[27] https://www.ifaxapp.com/hipaa/phi-hackers-risks-implications/ (last accessed May 2, 2026).

numbers. For example, the cybersecurity firm Trustwave discovered that medical records can fetch up to $250 per record on the dark web, while credit card numbers typically sell for around $5 each.[28]

54. Medical records are highly valuable to cybercriminals, not only because of the price it can be sold for on the dark web, but also due to the various ways it can be exploited. Cybercriminals can use stolen medical records to commit medical identity theft to submit fraudulent medical claims, purchase prescriptions, or receive unauthorized treatment. These actions pose significant threats and risks to patients whose medical information has been compromised, leading to potential financial, physical, and emotional harm.

55. According to the FTC, if a hacker or an individual to whom the hacker sells your medical information mixes it with your own, it could impact the medical care you receive, or the health insurance benefits available to you. The FTC's Medical Identity Theft Frequently Asked Questions highlight several red flags victims should watch for, including: (i) receiving bills for medical services they didn't receive, (ii) being contacted by debt collectors about medical debt they don't owe, (iii) seeing unrecognized medical collection notices on their credit report, (iv) spotting incorrect office visits or treatments on their explanation of benefits, (v) being informed by their health plan that they've reached their benefits limit, or (vi) being denied insurance because their medical records reflect a condition they do not have.

56. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also

[28] Trustwave Holdings, Inc., 2018 Trustwave Global Security Report, https://trustwave.azureedge.net/media/15350/2018-trustwave-global-security-report-prt.pdf (last accessed May 2, 2026).

between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[29]

57. Plaintiff and Class Members now face years of constant surveillance of their personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

**E. Defendants Failed to Comply with FTC Guidelines**

58. Defendants were also prohibited by the Federal Trade Commission Act ("FTCA") (15 U.S.C. § 45), from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has determined that a company's failure to implement reasonable and appropriate data security measures to protect consumers' sensitive personal information constitutes an "unfair practice" in violation of the Act. *See, e.g.*, *FTC v. Wyndham Worldwide Corp*., 799 F.3d 236 (3d Cir. 2015).

59. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

60. For example, in 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses.

[29] U.S. Gov't Accountability Off., Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, GAO-07-737 (June 4, 2007), https://www.gao.gov/assets/gao-07-737.pdf (last accessed May 2, 2026).

These guidelines advise businesses, *inter alia*, to protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[30]

61. The guidelines further advise businesses: not to maintain PII longer than necessary for authorization of a transaction; to limit access to sensitive data; to use an intrusion detection system to expose a breach as soon as it occurs; to monitor all incoming traffic for activity indicating someone is attempting to hack the system; to watch for large amounts of data being transmitted from the system; and to verify that third-party service providers have implemented reasonable security measures.[31]

62. To underscore the binding significance and legal ramifications of the promulgated guidance, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of FTCA, 15 U.S.C. § 45.[32] Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63. As evidenced by the Data Breach, Defendants failed to properly implement basic data security practices.

---

[30] Fed. Trade Comm'n, Protecting Personal Information: A Guide for Business, https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed May 2, 2026).
[31] *Id.*
[32] *See, e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015) (determining that a company's failure to implement reasonable and appropriate data security measures to protect consumers' sensitive personal information constitutes an "unfair practice" in violation of the Act).

64. Upon information and belief, Defendants were at all times fully aware of their obligations to protect the Private Information of Plaintiff and Class Members, and Defendants were also aware of the significant repercussions that would result from its failure to do so.

65. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' Private Information, or to comply with applicable industry standards, constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

**F. Defendants Failed to Comply with HIPAA**

66. Upon information and belief, Defendants acted as a business associates and/or otherwise received, maintained, or transmitted protected health and benefits-related information subject to HIPAA and related data security obligations, including the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Parts 160 and 164, Subparts A, C, and E.

67. Defendants are also subject, upon information and belief, to the requirements of the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), which strengthens and supplements HIPAA's privacy and security framework by, among other things, extending HIPAA's requirements to business associates and enhancing enforcement and breach notification obligations. See 42 U.S.C. § 17921 et seq.

68. HIPAA's Privacy Rule establishes national standards for the protection of individuals' health information, while the HIPAA Security Rule sets forth requirements for safeguarding electronic protected health information ("ePHI").

69. The HIPAA Security Rule requires covered entities and business associates to comply with applicable standards, implementation specifications, and requirements governing the protection of ePHI. See 45 C.F.R. § 164.302.

70. These obligations include, among other things, implementing administrative, physical, and technical safeguards to:

a. Ensure the confidentiality, integrity, and availability of ePHI that they create, receive, maintain, or transmit;

b. Protect against reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure that their workforce complies with applicable security requirements. See 45 C.F.R. § 164.306(a).

71. HIPAA requires entities to periodically review and update their security measures as necessary to maintain reasonable and appropriate protections for electronic protected health information ("ePHI"). See 45 C.F.R. § 164.306(e). HIPAA further requires the implementation of policies and procedures to prevent, detect, contain, and correct security violations involving ePHI. See 45 C.F.R. § 164.306(a).

**G. The Data Breach Increases Victims' Risk of Identity Theft and Fraud**

72. The Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

73. Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members.

74. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

75. Plaintiff's and Class Members' Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

76. Further, the standard operating procedure for cybercriminals is to use some data, like the Private Information here, to access and/or develop "fullz packages" of that person.[33]

77. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

---

[33] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See* https://venturebeat.com/security/fullz-dumps-and-cvvs-heres-what-hackers-are-selling-on-the-black-market/ (Last accessed May 2, 2026).
.

78. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a comprehensive Fullz package and sell it—and then resell it in perpetuity—at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

**H. Plaintiff and Class Members Suffered Damages**

79. Plaintiff's Private Information has presumably been compromised in the Data Breach. The extent of compromised Private Information is unknown but it likely includes Plaintiff's social security numbers, dates of birth, full or partial names, biometric data, telephone numbers, mailing and billing addresses, email addresses, information contained within state-issued photo identification (including driver's license number, organ donor status, and appearance). The Data Breach also likely compromised individuals' PHI, including patient and record identifiers, information relating to patient treatment (including billing and diagnosis codes, and the dates and locations of treatment), and insurance cards containing name and/or beneficiary number.

80. Cyberattacks have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets so that they are aware of, and prepared for, a potential attack.

81. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[34]

82. The type and breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendants' consumers especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

83. PI is a valuable property right.[35] The value of PI as a commodity is measurable.[36] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[37] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[38] It is so valuable to identity thieves that once PI has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

---

[34] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited May 2, 2026).

[35] *See* Marc Van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFORMATION & COMMUNICATION TECHNOLOGY 26 (May 2015), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . . . ").

[36] Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (Apr. 28, 2014), http://www.medscape.com/viewarticle./824192.

[37] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD 4 (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[38] *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERTISING BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report.

84. As a result of their real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, PI, and other sensitive information directly on various Internet websites, making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated, and becomes more valuable to thieves and more damaging to victims.

85. Even if the stolen PI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

86. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites." [39]

87. Based on the value of PI to cybercriminals and the growing rate of data breaches, Defendants certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

---

[39] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Information Systems Research 254 (June 2011), https://www.guanotronic.com/~serge/papers/weis07.pdf.

### I. Plaintiff Cartwright's Experience

88. Plaintiff Cartwright is a patient who underwent a procedure during which a pacemaker device manufactured by Defendants was implanted.

89. Upon information and belief, Plaintiff Cartwright Sensitive Private Information was accessed and exfiltrated in the Data Breach.

90. Plaintiff Cartwright would not have entrusted his information with Defendants if he knew of Defendants' deficient data security practices. Plaintiff Cartwright only allowed Defendants to maintain, store, and use his Sensitive Private Information because he reasonably expected that Defendants would use basic security measures to protect the information entrusted to it and prevent its access by unauthorized third parties.

91. As a result of the Data Breach, Plaintiff is at increased risk of suffering injuries, including fraudulent transactions attempted in their name and an increase in spam calls or text messages.

92. As a result of the disclosure of Sensitive Information to unauthorized individuals due to the data Breach, Plaintiff Cartwright has suffered an invasion of privacy.

93. As a result of the Data Breach, Plaintiff has suffered anxiety, stress, and emotional distress arising from the loss of control over his Sensitive Private Information and the ongoing risk of misuse.

## CLASS ACTION ALLEGATIONS

94. Plaintiff brings all counts, as set forth below, individually and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a Nationwide Class defined as:

> All persons whose Private Information was compromised as a result of the cybersecurity incident involving Defendants' systems that occurred on or around April 17, 2026. (the "Class").

95. Excluded from the Class are Defendants and their officers and directors; any entity in which Defendants have a controlling interest, are a parent or subsidiary, or which is controlled by Defendants; and the affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assigns of Defendants. Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

96. Plaintiff reserves the right to modify and/or amend the Class, including, but not limited to, creating additional subclasses as necessary.

97. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

98. ***Numerosity***—Federal Rule of Civil Procedure 23(a)(1). The members of the Class are so numerous that joinder of all Class members would be impracticable. On information and belief, the number of Class members is likely in the hundreds of thousands or millions.

99. ***Commonality and Predominance***—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3). Common questions of law and fact exist as to all members of the Class and predominant over questions affecting only individual members of the Class. Such common questions of law or fact include, *inter alia*:

a. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

b. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

c. Whether Defendants' properly implemented their purported security measures or their associate's purported security measures to protect Plaintiff and the Class's PI from unauthorized capture, dissemination, and misuse;

d. Whether Defendants' took reasonable measures to determine the extent of the Data Breach after they first learned of it;

e. Whether Defendants disclosed Plaintiff and the Class's PI in violation of the understanding that the PI was being disclosed in confidence and should be maintained;

f. Whether Defendants' conduct constitutes breach of an implied contract;

g. Whether Defendants willfully, recklessly, or negligently failed to maintain and execute reasonable procedures designed to prevent unauthorized access to Plaintiff and the Class's PI;

h. Whether Defendants were negligent in failing to properly secure and protect Plaintiff and the Class's PI;

i. Whether Defendants were unjustly enriched by their actions; and

j. Whether Plaintiff and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

100. Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and other members of the Class. Similar or identical common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that predominate in this action

101. ***Typicality***—Federal Rule of Civil Procedure 23(a)(3). Plaintiff' claims are typical of the claims of the other members of the Class, because among other things, all Class members

were similarly injured through Defendants' uniform misconduct described above and were thus all subject to the Data Breach alleged herein. Further, there are no defenses available to Defendants that are unique to Plaintiff.

102. ***Adequacy of Representation***—Federal Rule of Civil Procedure 23(a)(4). Plaintiff is an adequate representative of the Nationwide Class because his interests do not conflict with the interests of the Classes they seek to represent, they have retained counsel competent and experienced in complex class action litigation, and Plaintiff will prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and their counsel.

103. ***Injunctive Relief***—Federal Rule of Civil Procedure 23(b)(2). Defendants have acted and/or refused to act on grounds that apply generally to the Class, making injunctive and/or declaratory relief appropriate with respect to the Class.

104. ***Superiority***—Federal Rule of Civil Procedure 23(b)(3). A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for members of the Class to individually seek redress for Defendants' wrongful conduct. Even if members of the Class could afford individual litigation, the court system could not. Individualized litigation creates potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### Negligence

105. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

106. Defendants owed numerous duties to Plaintiff and the Class, including the following:

a. A duty to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PI in their possession;

b. A duty to protect PI using reasonable and adequate security procedures, systems, and resolutions that are compliant with industry-standard practices;

c. A duty not to subject Plaintiff and the Class's PI to an unreasonable risk of exposure and theft because Plaintiff and Class were foreseeable and probable victims of any inadequate security practices.

d. A duty to use reasonable security measures that arose as a result of the special relationship that existed between Defendants and patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law.

107. Upon Defendants accepting and storing the PI of Plaintiff and the Class in their computer systems and on their networks, Defendants undertook and owed a heightened duty to Plaintiff and the Class to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Defendants knew that the PI was private and confidential and should be protected as such.

108. Defendants' duty to use reasonable security measures under HIPAA for patient-related PI required Defendants to "reasonably protect" confidential data from "any intentional or

unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). At least a portion of the PI exfiltrated in this case likely constitutes "protected health information" within the meaning of HIPAA.

109. In addition, Defendants had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted, and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

110. Defendants' violation of the FTC Act and state data security statutes constitutes negligence *per se* for purposes of establishing the duty and breach elements of Plaintiff's negligence claim. Those statutes were designed to protect a group to which Plaintiff belongs and to prevent the type of harm that resulted from the Data Breach.

111. Defendants' duty to use reasonable care in protecting confidential data arose not only as a result of statutes and regulations, but also because cybersecurity and healthcare industry standards bound Defendants to protect confidential PI.

112. Defendants' own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their PI. Defendants' misconduct included failing to: (1) secure Plaintiff and Class members' PI; (2) comply with industry standard security practices; (3) implement adequate system and event monitoring; (4) respond to security alerts in a timely manner and (5) implement the systems, policies, and procedures necessary to prevent this type of data breach. Defendants were in a special position to ensure that their systems were sufficient to protect against the foreseeable risk of harm to Plaintiff and Class members from a data breach.

113. Defendants breached their duties, and thus were negligent, by failing to use reasonable measures to protect Plaintiff and Class members' PI. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiff and Class members' PI;

b. Failing to adequately monitor the security of Medtronics' networks and systems;

c. Allowing unauthorized access to Plaintiff and Class members' PI;

d. Failing to resolve in a timely manner that Plaintiff and Class members' PI had been compromised; and

e. Failing to offer protection to Plaintiff and Class members to mitigate the potential for identity theft and other damages.

But for Defendants' breach of their duties, the PI would not have been stolen.

114. Through Defendants' acts and omissions described in this Complaint, including their failure to provide adequate security and their failure to protect Plaintiff's and Class members' PI from being foreseeably captured, accessed, disseminated, stolen and misused, Defendants unlawfully breached their duty to use reasonable care to adequately protect and secure Plaintiff' and Class members' PI during the time it was within Defendants' possession or control.

115. Defendants' conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to, failing to adequately protect the PI of Plaintiff and Class members.

116. Plaintiff and Class members had no ability to protect their PI once it was in Defendants' possession and control. Defendants were in an exclusive position to protect against the harm suffered by Plaintiff and Class members as a result of the Data Breach.

117. Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent misuse of their PI as described in this Complaint.

118. There is a temporal and close causal connection between Defendants' failure to implement adequate data security measures, the Data Breach, and the harms suffered by Plaintiff and Class members.

119. Plaintiff and Class members are also entitled to injunctive relief requiring Defendants to, *e.g.*, (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) immediately provide free credit monitoring and compensation for harm to all Class members.

**COUNT II**
**Negligence *per se***

120. Plaintiff fully incorporates by reference all of the above paragraphs, as though fully set forth herein.

121. Defendants owed a duty to Plaintiff and Class members to keep their Sensitive Private Information secure, arising under FTC Act.

122. Specifically, Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by companies such as Defendants for failing to use reasonable measures to protect Sensitive Private Information. Various FTC publications and orders further form the basis of Defendants' duty.

123. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Sensitive Private Information and not complying with industry standards. Defendants'

conduct was particularly unreasonable given the nature and amount of Sensitive Private Information they obtained, received, stored, and maintained, and the foreseeable consequences of a data breach involving such highly sensitive information, including the damages that would result to Plaintiff and Class Members.

124. Plaintiff and Class members are consumers within the class of persons Section 5 of the FTC Act was intended to protect.

125. Defendants are, upon information and belief, either HIPAA-covered entities and/or business associates of covered entities, as defined by HIPAA, in that they create, receive, maintain, and/or transmit protected health information.

126. Plaintiff and the Class, as patients, are within the class of people HIPAA was designed to protect and HIPAA was intended to protect Plaintiff and the Class against the type of harm that occurred, namely, unauthorized access to Plaintiff's and the Class's medical information.

127. Defendants' implementation of inadequate data security failed to comply with HIPAA, including its Security Rule requirements governing the protection of electronic protected health information.

128. Defendants' violations of Section 5 of the FTC Act as well as HIPAA constitute negligence *per se*.

129. Defendants violated its duties by, among other things, inadequate security systems, protocols and practices that were insufficient to protect the Sensitive Private Information of Plaintiff and Class members, and by failing to timely and adequately notify Plaintiff and Class members of the Data Breach.

130. Defendants' violations constitute negligence per se because Defendant violated laws designed to protect a specific class of persons—Plaintiff and Class members—from a particular type of harm that Defendants' conduct caused.

131. Plaintiff and Class members suffered injuries of the type the statutes were intended to prevent, including: (a) increased risk of actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (b) the loss of the value of their privacy and the confidentiality of the stolen Sensitive Private Information and loss of control over their Sensitive Private Information; (c) the illegal sale of the compromised Sensitive Private Information on the black market; (d) the present and continuing threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; (e) mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; (f) the time spent in response to the Data Breach reviewing bank statements, credit card statements, financial account statements, credit reports, health insurance statements, and other related activities; (g) the expenses incurred and time spent initiating fraud alerts; (h) the resulting decrease in credit scores and ratings; (i) emotional distress; (j) their lost work time; (k) the lost value of the Sensitive Private Information; (l) the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; and (m) nominal and general damages and other economic and non-economic harm suffered.

132. Defendants' violations of these statutes were a direct and proximate cause of Plaintiff's and Class members' injuries and damages.

133. As a result of Defendants' negligence *per se*, Plaintiff and Class members are entitled to all relief available under law, including compensatory and consequential damages,

statutory damages where available, injunctive relief, and such other relief as the Court deems just and proper.

**<u>COUNT III</u>**
**Breach of Implied Contract**

134. Plaintiff and Class Members re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

135. Defendants obtained, received, stored, and maintained the Private Information of Plaintiff and the Class, including in connection with the use of its implanted medical devices and related services.

136. Plaintiff and Class Members' Private Information was provided to, transmitted to, and/or made accessible to Defendants in the ordinary course of medical treatment, including in connection with the implantation, operation, and monitoring of medical devices manufactured by Defendants. Plaintiff and Class Members, or their healthcare providers acting on their behalf, paid money for Defendants' devices and related services, and would not have done so, or would have paid less, had they known that Defendant's data security practices were substandard.

137. Defendants solicited, obtained, and/or received Class Members' Private Information as part of their regular business practices, including through healthcare providers, device-related services, and associated data systems.

138. Plaintiff and Class Members entrusted, directly or indirectly, their Private Information to Defendants with the understanding that Defendants would safeguard their information.

139. Defendants accepted possession of Plaintiff's and Class Members' Private Information for the purpose of engaging with Plaintiff and Class Members, including in connection with its medical devices and related services, and to further its business.

140. When Plaintiff and Class Members provided, or had provided on their behalf, their Private Information to Defendants in connection with receiving medical devices and related services associated with Defendants, they entered into implied contracts with Defendants.

141. Plaintiff and the Class Members thus entered into implied contracts with Defendants by which Defendants agreed to safeguard and protect their Private Information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached, compromised, or stolen.

142. In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendants' data security practices complied with relevant laws and regulations (including FTC guidelines on data security and HIPAA) and were consistent with industry standards.

143. Implicit in the agreement between Plaintiff and Class Members on the one hand, and Defendants on the other, was Defendants' obligation to: (a) use such Private Information for business purposes only; (b) take reasonable steps to safeguard that Private Information; (c) prevent unauthorized disclosures of the Private Information; (d) provide Plaintiff and Class Members with prompt and sufficient notice of any unauthorized access and/or theft of their Private Information; (e) reasonably safeguard and protect the Private Information from unauthorized disclosure or use; and (f) retain the Private Information only under conditions that kept such information secure and confidential.

144. The parties' mutual understanding and intent to form an implied contract is demonstrated by their conduct and course of dealing.

145. On information and belief, Defendants implemented written privacy policies promising to disclose Private Information only under limited circumstances not applicable to the

Data Breach, and further agreed, expressly and/or impliedly, to comply with industry standards and safeguard such information.

146. Plaintiff and Class Members, or their healthcare providers acting on their behalf, paid for Defendants' devices and related services with the reasonable expectation that Defendants would maintain adequate data security, which they failed to do.

147. Plaintiff and Class Members would not have entrusted their Private Information to Defendants, directly or indirectly, or engaged in treatment involving Defendants' devices, absent Defendants' implied promise to safeguard such information and implement reasonable data security measures.

148. Plaintiff and Class Members performed their obligations under the implied contract.

149. Defendants breached the implied contracts by failing to implement reasonable data security measures, failing to timely and accurately disclose the Data Breach, failing to delete information when no longer necessary, and otherwise failing to safeguard Plaintiff's and Class Members' Private Information.

150. Defendants also breached the implied covenant of good faith and fair dealing inherent in the implied contracts by engaging in the foregoing conduct and by continuing to collect, receive, and store Private Information despite known or foreseeable security vulnerabilities.

151. As a direct and proximate result of Defendants' breaches, Plaintiff and Class Members suffered damages, including, but not limited to, invasion of privacy, theft and diminished value of their Private Information, mitigation costs and time, loss of the benefit of the bargain, increased unsolicited communications, statutory and nominal damages, and an ongoing risk of misuse.

152. Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages.

153. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to improve data security practices, submit to audits, and provide adequate credit monitoring and identity protection services

## COUNT IV
## Unjust Enrichment/Quasi-Contract

154. Plaintiff and Class Members re-allege and incorporate by reference all preceding allegations as if fully set forth herein.

155. This claim is pled in the alternative to Plaintiff's breach of implied contract claim.

156. Plaintiff and Class members conferred benefits upon Defendants.

157. In exchange for providing payment and PI, Plaintiff and Class members should have received adequate safeguarding of their PI.

158. Defendants knew that Plaintiff and Class members conferred a benefit on it and accepted, has accepted, or retained that benefit. Defendants profited from Plaintiff' payments and used Plaintiff and Class members' PI for business or business associate purposes. Defendants have not compensated the victims of the Data Breach.

159. Defendants failed to secure Plaintiff's and Class members' PI and, therefore, did not provide full compensation for the benefit the Plaintiff' and Class members' PI provided.

160. Defendants acquired the PI through inequitable means as they failed to disclose the inadequate security practices previously alleged.

161. If Plaintiff and Class members knew that Defendants would not secure their PI using adequate security, they would not have made transactions with Defendants or Defendants' associates.

162. Under the circumstances, it would be unjust for Defendants to be permitted to retain any of the benefits that Plaintiff and Class members conferred on them.

163. Under principles of equity and good conscience, Defendants should not be permitted to retain the full monetary benefit of their transactions with Plaintiff and Class members. Defendants failed to adequately secure the PI it held and, therefore, did not provide the full services that Plaintiff and Class members directly or indirectly paid for. Patients now must monitor their personal, immutable PI for the rest of their lives.

164. If Plaintiff and Class members knew that Defendants employed inadequate data security safeguards, they would not have agreed to provide Defendants with PI.

165. As a direct and proximate result of Defendants' conduct, Plaintiff and Class members have suffered the various types of damages alleged herein.

166. Plaintiff and Class members have no adequate remedy at law. Defendants continue to retain Plaintiff and Class members' PI, and similar data security practices and vendors while exposing the PI to a risk of future data breaches of PI in Defendants' possession.

167. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that they unjustly received from them. In the alternative, Defendants should be compelled to refund the amounts that Plaintiff and Class members overpaid.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests the following relief:

(a) An Order certifying this case as a class action;

(b) An Order appointing Plaintiff as class representative;

(c) An Order appointing the undersigned counsel as class counsel;

(d) An award of compensatory damages to Plaintiff, money for significant and reasonable identity protection services, statutory damages, treble damages, and damages;

(e) Injunctive relief requiring Defendants to, *e.g.*: (i) strengthen and adequately fund their data security systems and monitoring procedures; (ii) submit to future independent annual audits of those systems and monitoring procedures; (iii) implement encryption of sensitive PI in all databases for all clients; and (iii) immediately provide free credit monitoring to all Class members;

(f) An Order for Defendants to pay equitable relief, in the form of disgorgement and restitution, and injunctive relief as may be appropriate;

(g) An Order for Defendants to pay both pre- and post-judgment interest on any amounts awarded; and

(h) An award of Plaintiff's attorneys' fees and litigation costs; and

(i) Such other and further relief as this Court may deem just and proper.

Dated: May 5, 2026

Respectfully submitted,

By: *_/s/Rebecca A. Peterson_*

Rebecca A. Peterson (MN Bar #392663)
Krista K. Freier (MN Bar #390223)
Catherine A. Peterson (MN Bar #505172)
**HECHT PARTNERS LLP**
1650 West 82nd Avenue, Suite 880
Bloomington, MN 55431
Phone: (612) 778-9595
Facsimile: (888) 421-4173
rpeterson@hechtpartners.com
kfreier@hechtpartners.com
cpeterson@hechtpartners.com

Lori G. Feldman
Justin Alvarez-Herman
**HECHT PARTNERS LLP**
125 Park Avenue, 25th Floor
New York, NY 10017
Phone: (212) 851-6821
lfeldman@hechtpartners.com
jalvarezherman@hechtpartners.com

Raphael Janove
**JANOVE PLLC**
115 Broadway, 5th Fl.
New York, NY 10006
Phone: (646) 347-3940
Facsimile: (646) 810-2042
raphael@janove.law

Jason D. Gustafson (MN Bar #403297)
**THRONDSET MICHENFELDER, LLC**
80 South 8th Street, Suite 900
Minneapolis, MN 55402
Phone: (763) 515-6110
jason@throndsetlaw.com

*Attorneys for Plaintiff and Putative Class*